# William H. Gatzmer et al., Trustees, Plffs. in Err., v. Philip Moyer.

A sale of standing timber vests the title in the purchaser, whether the quantity is to be ascertained by estimation, scaling on the ground, or mill measure.

The delivery is complete the moment the contract is executed.

(Argued March 13, 1888. Decided April 23, 1888.)

January Term, 1887, No. 287, E. D., before GORDON, Ch. J., PAXSON, STERRETT, CLARK, and WILLIAMS, JJ. Error to the Common Pleas of Clinton County to review a judgment on a verdict for the defendant in a sheriff's interpleader, January term, 1887, No. 31. Affirmed.

This was a feigned issue to determine the ownership of a saw‌mill building, a boiler, an engine, 50,000 feet of oak, and 100,‌000 feet of hemlock logs, levied on as the property of John L. Freck, at the suit of Philip Moyer, and claimed by W. H. Gatzmer and M. Hall Stanton, trustees. In this issue the claimants were plaintiffs and the plaintiff in the execution was defendant.

At the trial it appeared that the following contract had been made in respect to the timber, etc., in dispute:

"Articles of agreement made and concluded this 4th day of November, 1880, between John F. Bickel, of Delaware county, in the state of Pennsylvania, and William H. Gatzmer, of the city of Philadelphia, in said state, committee of the bondholders of the Karthaus Coal & Lumber Company, parties of the first part, and John L. Freck, of Millersburg, in the county of Dauphin and state aforesaid, of the second part—Witnesseth: That said parties of the first part hereby covenant, bargain, and sell to the said party of the second part all the standing and fallen white pine timber and the butts which will make shingles,

and all the standing and fallen oak timber, to include all timber which will make a log 12 inches in diameter at the small end, growing, lying, and being on the lands of the said the Karthaus Coal & Lumber Company, now of the said bondholders, within the following limits, *viz.:* On the top of the ridge between Shintown run and Drury's run and on the eastern slope which would naturally come into Drury's run—the quantity of said timber to be cut and taken to be ascertained and determined by the saw account and the bills of shipment, which are to be equally and freely accessible to all parties concerned; the shingles of the grades of number 1 and number 2 to be accounted for, and the shingles below those grades not to be paid for; the parties of the first part to have free access to the books, accounts, and papers of the party of the second part and to any and other means necessary to enable them to ascertain the quantities and qualities of said timber.

"And the said party of the second part, his executors and administrators, covenant, promise, and agrees that he will pay said parties of the first part, their successors, executors, administrators, and assigns, for said timber as follows, to wit: At the price or stumpage of 75 cents per M for shingles of numbers 1 and 2, and $5 per M feet, board measure, for oak timber; and all lumber sold by said Freck to the Pennsylvania Railroad Company to be settled for and paid for to said parties of the first part as aforesaid, monthly, in cash; and all other lumber cut and taken under this agreement to be settled for monthly and paid for by giving negotiable and bankable paper satisfactory to said parties of the first part, to run not longer than ninety days after said monthly settlement. If any pine cut should prove worm eaten and not fit for shingles, it may be cut into bill timber, and shall be accounted for, settled, and paid for, the same as if it had been manufactured into shingles of number one and two qualities.

"The said Freck agrees to cut and clean said land of said timber within three years after the date hereof, and at the end of said term to forfeit his right to cut on or occupy said land, or any part thereof, and to yield the same up peaceably to said parties of the first part, their successors or assigns.

"It is hereby further agreed that said Freck shall have the privilege of erecting and building a steam sawmill on the lands of said party of the first part anywhere he may choose and

select, so that said improvement does not obstruct any stream flowing on said lands, without rent or charge during the time or term of this agreement, and at the end thereof said building to be quietly surrendered and given up to said parties of the first part, their successors or assigns.

"The said Freck to have the use of the boiler and engine of said parties of the first part now in the sawmill on the top of the mountain, without charge, during the continuance of this agreement, and to be returned to said parties of the first part, their successors or assigns, at the end of the operations under the same, in the same good order and condition in which it is now.

"The said Freck is also to have the use of the dam and slide on Drury's run, free of charge, during his operations under this agreement, but so as not to interfere with the existing contract between said parties of the first part and Williams and Foresman, and so as not to hinder in any way the operations of said Williams and Foresman or their use of said slide and dam; the said Freck to use the same only after the lumber of Williams and Foresman has passed out of the same.

"The said Freck is also to have the use of all the piling ground necessary for his operations, under and during the term of this agreement, and the use of the railroad of said parties of the first part during his operations hereunder, any repairs which he may need to the same to be done at the expense of himself, the said Freck; but he shall have the right to cut timber of the said parties of the first part for said repairs without charge; he shall also have timber from said land without charge for the erection and construction of said sawmill and which he agrees to erect and construct at his own proper cost and charges—the said building when erected to belong to the said parties of the first part, subject to the rights of the said Freck in it, under and during the term of this agreement.

"And he, the said Freck agrees to insure said building to about the amount of the value of it, and as if he was the owner of the same; the insurance money to be used in rebuilding the mill, so that the operations and provisions of this contract may be fully carried out and effected.

"It is further agreed that in ascertaining said stumpage for the shingles manufactured under this agreement the same shall

be reckoned as if 24 inches in length and of the average width of 5 inches.

"And it is hereby further agreed that the said Freck shall have the refusal of the hemlock timber upon the above mentioned territory, from the date hereof to the first day of July next, at the price or rate of one $^{50}/_{100}$ dollars per M feet, board measure, stumpage to be paid as the parties may agree; the timber to be scaled on the ground by a competent scaler to be agreed upon by the parties; said Freck to notify said parties of the first part, their successors or assigns, in writing, within said term of refusal, if he concludes to take said hemlock timber."

On August 17, 1881, a further agreement had been entered into as follows:

"Supplement to Articles of Agreement, made and concluded the 4th day of November, 1880, between John F. Bickel, of Delaware county, in the state of Pennsylvania, and William H. Gatzmer, of the city of Philadelphia, in said state, committee of the bondholders of the Karthaus Coal & Lumber Company, of the first part, and John L. Freck, of Millersburg, in the county of Dauphin and state aforesaid, of the second part.

"Witnesseth: That said parties of the first part hereby covenant, bargain, and sell to the said party of the second part all the standing and fallen oak timber which will make a log 12 inches in diameter at the small end, and all the white pine butts which will make shingles of 24 inches in length and of an average width of 5 inches growing, lying, and being upon that portion of the lands formerly of the Karthaus Coal & Lumber Company, now of the said bondholders, lying on the northeasterly side of Drury's run, in the county of Clinton and state aforesaid, at the price named, and under and subject to all the conditions and agreements fully set forth in the articles of agreement above referred to, to which this is a supplement.

"The said Freck agrees to cut and clean said lands of said timber within five years after the date hereof, and at the end of said term to forfeit his right to cut on or occupy said land or any part thereof and to yield the same up peaceably to said parties of the first part, their successors or assigns."

Freck took possession and began operations under these

agreements, and before the first day of July, 1881, notified the bondholders that he would purchase the hemlock timber as specified, and it was afterward cut up into logs.

The mill was built and afterward destroyed by fire. In the fire the engine was destroyed, and Freck substituted another for it.

The court below directed a verdict for the engine and boiler, in favor of the plaintiffs in the issue.

As to the lumber the court charged:

"Now, we come to the question of the title to the lumber upon these premises, the 50,000 feet, more or less, of the oak logs, and 100,000 feet, more or less, of hemlock logs levied upon by the sheriff. By the terms of the contract with Freck the trustees covenanted, bargained, and sold unto him all the white pine timber, and he was to go on and manufacture them into lumber and pay a certain price per M feet, according to the sawmill count.

"We are of the opinion and so instruct the jury that under the terms of this agreement, when Mr. Freck went into possession of the land and cut this oak and hemlock timber and severed it from the freehold and made it into logs, the title of the logs was vested in Freck; and his execution creditors could levy upon and sell them as his property.

"By the terms of this agreement as we construe and interpret it the title would be in Mr. Freck, and not in these trustees. They could have no lien on this lumber by virtue of their agreement. They sold the white pine and oak timber at so much per thousand; and although the agreement specifies how the quantity is to be ascertained, yet we do not think this stipulation in the agreement would serve to hold the title to the timber in the trustees after Freck went into possession, had cut the timber into logs, and was about to manufacture them into lumber. [1]

"We therefore instruct the jury that as to the oak and hemlock logs the title would be in John L. Freck, and his execution creditors could levy upon them and sell them. And the jury should render a verdict in favor of the defendant for the oak and hemlock logs." [2]

The plaintiffs submitted the following points:
1. That while anything remained to be done, by the terms of

the contract between the plaintiffs and John L. Freck, to ascertain the quantity of the timber in question and the amount to be paid for it by Freck, the contract was executory, and the property in the logs remains in the plaintiffs.

*Ans.* Refused. [3]

2. That the logs in controversy not having passed through the saw at the time they were levied upon by the sheriff, they remained the property of the plaintiffs, by the force of the terms of said contracts.

*Ans.* Refused. [4]

The defendant submitted the following points.

1. The agreements of November 4, 1880, and August 17, 1881, covenant, bargain, and sell all the timber upon the lands therein mentioned to John L. Freck. Their legal effect is to vest in him the ownership of all the said timber, from and after the time he was put in possession of said lands in pursuance of said agreement.

*Ans.* Affirmed. [5]

2. The plaintiffs allege in the declaration that they were, at the date of the levy in this case, the absolute owners of the oak and hemlock timber claimed by them, and before they can recover, must prove such absolute ownership in themselves; and inasmuch as the agreement offered in evidence by them and the other testimony in the case fails to establish such absolute ownership of the said oak and hemlock timber, the verdict, so far as said timber is concerned, must be in favor of the defendant.

*Ans.* Affirmed. [6]

The assignments of error specified: (1–2) The portions of the charge quoted, and (3–6) the answers to points.

*Seymour D. Ball,* for plaintiffs in error.—Delivery of possession alone is not sufficient in an executory contract to pass the title to the purchaser; besides delivery at the place agreed there must be the intention of the owner, manifested by his acts and declarations, to pass the title; and such intention is a question for the jury. Lester v. McDowell, 18 Pa. 91; Susquehanna Boom Co. v. Finney, 58 Pa. 200.

In the sale of cumbersome chattels, not reasonably capable of actual delivery (as timber in the woods), everything must be done that reasonably can be done to show the change of own-

ership.    Marking timber in such cases is held to be reasonably necessary to indicate the change of title from the vendor to the vendee.    If levied upon by a creditor of Gatzmer and Stanton, trustees, this is what Freck would have been required to show to hold the hogs.    Haynes v. Hunsicker, 26 Pa. 62; Chase v. Ralston, 30 Pa. 539; Pier v. Duff, 63 Pa. 59.

In this case the logs were not marked in any way; and therefore all was not done which the law requires to show change of property.

The option in the first agreement in reference to the hemlock was exercised within the proper time, and the contract was changed by parol so that instead of buying the hemlock as provided in the written agreement, "to be scaled on the ground," they agreed that it should be purchased and measured the same as the white pine and oak; that is, "the quantity of said timber to be cut and taken to be ascertained and determined by the saw account," etc.    This change in the written contract by parol made an admixture of written and parol evidence as to what the contract was which took the whole to the jury, and it was error in the court to interpret the contract as if the whole was written, and give binding instructions to the jury to find for the defendant for the oak and hemlock logs.    Sidwell v. Evans, 1 Penr. & W. 383, 21 Am. Dec. 387; Bomeisler v. Dobson, 5 Whart. 398.

Where anything remains to be done by the terms of the agreement for the purpose of ascertaining what is to be paid for personal property sold, such as weighing, measuring, or scaling, where the amount to be paid depends upon such weighing, measuring, or scaling, as provided by the agreement, the performance of those things shall be a condition precedent to the transfer of the property, although the individual goods be ascertained.    2 Story, Contr. § 800; 1 Parsons, Contr. 527; Benjamin, Sales, §§ 310, 364, 407, 417; 2 Kent. Com. 496, Scott v. Wells, 6 Watts & S. 357, 40 Am. Dec. 568; Dennis v. Alexander, 3 Pa. St. 50; Nicholson v. Taylor, 31 Pa. 128, 72 Am. Dec. 728; Nesbit v. Burry, 25 Pa. 208.

A plaintiff in a feigned issue who claims an absolute title to the property when he had but a lien for advances will not be permitted to amend by changing the nature of his claim.    Horton v. McCurdy, 37 Phila. Leg. Int. 377.

When absolute and exclusive property is pleaded it must be

proved; and where a claimant fails to prove the absolute and ex-·clusive ownership, as the issue asserts, he may be rightly non-suited. Meyers v. Prentzell, 33 Pa. 484; Stewart v. Wilson, 42 Pa. 452.

In any way the rulings of the court below may be viewed, they are fully sustained by the decision in Watts v. Tibbals, 6 Pa. 448.

*S. J. M. McCarrell, J. R. Youngman,* and *C. G. Furst,* for defendant in error.—A sale of property such as standing timber is none the less perfect because the gross amount to be paid must be ascertained from evidence. Scott v. Wells, 6 Watts & S. 361, 40 Am. Dec. 568.

PER CURIAM:

After a careful examination of the evidence in this case and the arguments of counsel, we fail to discover wherein the court below committed error. The only material question was the construction of the agreement of the 4th of November, 1880. We can make nothing out of that contract but a positive sale of the timber on the ground, whether standing or fallen, at a fixed price for the stumpage. This vested the property in Bickel; and whether the quantity was to be ascertained by estimation, by scaling on the ground, or by mill measure, was a matter that could not affect the right of property.

The question of delivery did not enter into the contract. If it had, a different phase might have been presented; but here the delivery was of a mere right which was complete the moment the contract was executed. It was not the business of the trustee to deliver the timber, but of Bickel to enter upon the premises and take it. They could have enforced that contract whether he did so take or not; and had the timber been destroyed by fire, storm, or otherwise, the loss must have fallen on the vendee.

The judgment is affirmed.